**UNITED STATES of America,**
**Appellee,**

**v.**

**Leotha BARROW, also known as "Petey", Defendant,**

Calvin Johnson, also known as "Kyle", Defendant–Appellant.

Docket No. 03–1074.

United States Court of Appeals, Second Circuit.

Argued: Sept. 14, 2004.

Decided: March 2, 2005.

Richard B. Lind, New York, New York, for Defendant–Appellant.

John Nathanson, Assistant United States Attorney (Emily Berger, Assistant United States Attorney, on the brief), for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, New York, for Appellee.

Before: SACK, RAGGI, and HALL, Circuit Judges.

RAGGI, Circuit Judge.

Calvin Johnson appeals from a judgment of conviction entered on February 5, 2003, after a jury trial in the Eastern District of New York (Nicholas G. Garaufis, *Judge*) at which he was found guilty on four counts of distributing or possessing with intent to distribute cocaine base ("crack cocaine"), *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(C); one count of distributing or possessing with intent to distribute cocaine, *see id.;* one count of conspiring to distribute or possess with intent to distribute heroin, *see id.* §§ 841(b)(1)(C), 846; and one count of distributing or possessing with intent to distribute heroin, *see id.* §§ 841(a)(1),—(b)(1)(C). Sentenced to a 70–month term of incarceration, which he is presently serving, three years' supervised release, and a $700 special assessment, Johnson now seeks reversal of his conviction and a new trial based on two alleged evidentiary errors: (1) the admission into evidence of his pretrial proffer statements to rebut trial assertions made by defense counsel, and (2) the admission of expert testimony from a law enforcement officer who also testified as a fact witness. Because we conclude that both evidentiary rulings were within the district court's discretion, we hereby AFFIRM the judgment of conviction.

## I. *Factual Background*

### A. *Johnson's Drug Dealing*

From March 2001 to the end of that year, law enforcement authorities used a confidential informant and undercover police officers to investigate narcotics trafficking at and in the vicinity of 215 Schaefer Street, Brooklyn. The initial target of the investigation was Leotha Barrow, also known as "Petey," from whom confidential

informant Carvin Skidmore made several purchases of crack cocaine in March 2001. By April 2001, however, authorities began to focus on Barrow's confederate, defendant Calvin Johnson. At trial, the prosecution proved Johnson's distribution of drugs, or his possession of drugs with intent to distribute, on the following days:

### 1. *April 19, 2001*

On April 19, 2001, law enforcement authorities sought to have informant Skidmore introduce a New York City undercover officer, Detective Luis Campana, to Leotha Barrow as a potential purchaser of crack cocaine. To arrange the meeting, Skidmore placed an unrecorded telephone call to Barrow. Detective Patricia Rodriguez, a member of the investigative team, testified that she overheard Skidmore say the name "Cal" in the course of his conversation with Barrow.[1]

After the telephone call, Skidmore and Det. Campana proceeded to 215 Schaefer Street, a three-story red-brick building. Det. Campana testified that, in the second-floor hallway, they encountered defendant Johnson who asked them whom they wanted to see. When Det. Campana stated, "Petey," Johnson replied that he was not around and asked the men what they were "looking for." Trial Tr. at 73. Skidmore said he was looking for "ten bags," and Det. Campana said he was interested in "nine." *Id.* Skidmore and Det. Campana then paid Johnson $10 for each bag requested, whereupon Johnson went into a room, emerging a few minutes later to hand the two purchasers a total of nineteen ziplock bags, each containing a white rocky substance that laboratory analysis subsequently confirmed to be crack cocaine.

### 2. *May 15, 2001*

Skidmore and Det. Campana returned to 215 Schaefer Street on May 15, 2001. Encountering Johnson on the street, the informant and the detective told him that they each wanted "ten" and paid Johnson in cash. *Id.* at 81. Johnson pulled a bag out of his pants from which he removed twenty smaller bags, each containing crack cocaine.

### 3. *August 15, 2001*

Three months later, on August 15, 2001, Det. Campana went to 215 Schaefer Street without Skidmore, meeting Johnson on the stoop. In addition to Det. Campana testifying to the meeting, a videotape and audiotape of the encounter were played for the jury.[2] Initially, Johnson professed not to recognize the detective. Det. Campana reminded Johnson of previous purchases of crack that he had made in the company of Carvin Skidmore, and he stated that he was now interested in purchasing another "ten." *Id.* at 83. Before proceeding, Johnson demanded that the officer lift his shirt, presumably to check that he was not wearing a recording device. Apparently satisfied, Johnson sold Det. Campana ten ziplock bags of crack cocaine.

### 4. *August 22, 2001*

Soon thereafter, on August 22, 2001, Det. Campana returned to 215 Schaefer Street, with fellow officers again video— and audiotaping his outdoor movements.

---

1. On cross-examination, Det. Rodriguez explained that, in her report of the events of April 19, 2001, she spelled the name "Kyle," because that was how she had initially understood the informant, who, she said, "speaks with a street accent." Trial Tr. at 55–57.

2. Defense counsel argued that the person in the videotape was not Johnson but Leotha Barrow's brother, Jamal. In light of the verdict finding Johnson guilty of distributing crack on August 15, 2001, we must assume that the jury rejected this argument.

Seeing Johnson on the street in the company of several persons, Det. Campana called out, "Cal." Johnson replied by asking Det. Campana "how many" he wanted. Trial Tr. at 91–92, 111–13. Soon thereafter, Det. Campana gave Johnson $100, whereupon Johnson gave the detective ten ziplock bags of crack cocaine.

### 5. December 8, 2001

On December 8, 2001, New York City undercover Detective Deanna Delesbore went to the corner of Knickerbocker and Schaefer Streets where she spotted Calvin Johnson, who was soon joined by another man. Det. Delesbore asked if they had any "sniff," a street term for heroin or cocaine. Id. at 187. The second man said he did not have anything there but asked Det. Delesbore to wait. Johnson and his companion got into a car driven by a third person and left the scene. Returning a short while later, the second man gestured for Det. Delesbore to deal with Johnson, who, in exchange for $20, sold her two glassine envelopes with small grains of powder that laboratory analysis confirmed to be heroin.

At about the same time, another undercover officer, Detective Antoine Manson, also approached the corner of Knickerbocker and Schaefer Streets and purchased a glassine envelope of heroin grains from Johnson. Soon thereafter, Johnson was arrested. On his person, police officers found a small quantity of cocaine and several hundred dollars in cash, including pre-recorded buy money from the undercover purchases.

### B. The Federal Charges and the Proffer Agreement

Within days of Johnson's arrest, federal authorities decided to prosecute Johnson and Leotha Barrow for crack dealing. A complaint filed December 11, 2001, in the Eastern District of New York alleged that Barrow had sold crack to a confidential informant on March 9, 2001; March 12, 2001; and April 3, 2001. It alleged that Johnson had sold crack to an undercover officer on April 19, 2001, and to a confidential informant on April 26, 2001. The complaint further charged that on May 15, 2001, after the confidential informant and the undercover officer spoke with Leotha Barrow, they met with Johnson who sold them crack. It alleged that Johnson again sold crack to the undercover officer on August 15, 2001, and on August 22, 2001.

A federal indictment was filed against Johnson and Leotha Barrow on March 4, 2002, charging them with conspiracy to distribute crack and substantive distribution on the aforementioned dates.[3] The following month, Johnson began to explore cooperation with prosecutors.

Toward that end, on April 24, 2002, Johnson signed a proffer agreement, which controlled his debriefing on that day. He signed additional agreements, identical in pertinent part, at subsequent debriefings on May 2, 2002, and June 3, 2002. The agreements uniformly represented that federal prosecutors would not use any proffer statements made by Johnson either in their case-in-chief at trial or at sentencing. Nevertheless, the agreements stated that prosecutors could use Johnson's proffer statements as leads to other evidence; as substantive evidence to cross-examine him; and "as substantive evidence to rebut any evidence offered or elicited, or factual assertions made, by or on behalf of [Johnson] at any stage of a criminal

---

**3.** This indictment was superseded to add heroin and cocaine charges based on the December 8, 2001 undercover purchases.

prosecution (including but not limited to detention hearing, trial or sentencing)." Proffer Agreement, Apr. 24, 2002, at 1; *see also* Proffer Agreement, May 2, 2002, at 1; Proffer Agreement, June 3, 2002, at 1. It is the quoted passage that is at issue on this appeal.

### C. *The Use of Proffer Statements at Trial*

By letter dated June 28, 2002, Johnson's counsel, who also represents him on this appeal, advised prosecutors that his client no longer wished to pursue cooperation. In late October 2002, when Johnson's case proceeded to trial, an issue arose as to the admissibility of Johnson's proffer statements to rebut assertions made by his counsel in his opening statement to the jury and in his cross-examination of Det. Campana.

### 1. *The Precipitating Actions by Defense Counsel*

In his opening statement, Johnson's counsel announced that the defense theory was mistaken identity: "I want to be very clear with you at the outset, what the defense's position is as to the first four sales [i.e., the crack sales] and that is, that this is a case of mistaken identity." Trial Tr. at 22. In support of this theory, defense counsel stated that Leotha Barrow's brother Jamal was the real perpetrator of the charged crimes:

> [T]he guy on that tape, on August 15th, is not Calvin Johnson but Jamal Barrow, and the person who sold drugs to the undercover agent April 19th, 2001 was not Calvin Johnson, it was Jamal Barrow, the same person who is on that tape. And on May 15th it was Jamal Barrow not Calvin Johnson, the same person who is on the August 15th tape.

> ... And that's the person who also sold not only on August 15th, but also, August 22nd to the same undercover. *Id.* at 22–23.

In cross-examining Det. Campana, defense counsel not only highlighted various discrepancies between the officer's testimony regarding the April 19, 2001 crack sale and his official report, he accused Det. Campana of fabricating his meeting with the confidential informant at 215 Schaefer Street on that date: "You made up about meeting the C.I. there that day, didn't you?" Trial Tr. at 124.

### 2. *The Arguments and the Ruling on Admissibility*

The government argued that it was entitled to rebut the assertions made by counsel in his opening statement and on cross-examination with proffer statements by Johnson admitting that he routinely sold crack at 215 Schaefer Street in 2001. In response, defense counsel conceded that Johnson "admitted that ... he sold crack out of 215 Schaffer [sic] Street." *Id.* at 156. But, "[h]e did not admit, my recollection is, that he sold on any of the occasions presently charged in the indictment ...." *Id.* The government submitted that counsel's distinction was disingenuous because "at the time of the proffer statements," Johnson had "the complaint, which charged specifically the dates and in detail the transactions that occurred at 215 Schaffer [sic] Street. He also had the indictment, which charged him on the specific dates that we are now hearing testimony about." *Id.* at 157. In any event, the government argued that one statement by Barrow could fairly be construed as an admission to the charged April 19, 2001 crack sale.

Johnson related that [Leotha] Barrow was responsible for Johnson's arrest. Johnson recalled that Carvin Skidmore

called Barrow asking for ten bags of crack cocaine. Since Barrow did not have the ten bags he sent Skidmore to Johnson who sold Skidmore the crack. If—the government will argue on summation that specific reference relates to the April 19th sale, which the undercover already testified about and [defense counsel] Mr. Lind elicited on cross-examination I believe from Detective Rodriguez, that Carvin Skidmore made a call that day to purchase ten bags of crack cocaine, that when the [undercover] arrived at 215 Schaffer [sic] that undercover asked, hey, we are looking for Petey, which is the codefenda[n]t, Barrow's, nickname. Instead, Johnson sold the crack to both Mr. Skidmore and the undercover officer. That's a specific reference to the sale here, Your Honor.

*Id.* at 158.

The district court ruled that defense counsel's assertions were fairly rebutted by evidence of Johnson's proffer statements "that he sold crack cocaine from that location during the same period of time," although the court advised defense counsel that he could certainly argue to the jury that the admissions did not relate to the specific dates charged in the indictment. *Id.* at 160.[4]

### 3. *The Proffer Statements Offered in Evidence*

Elizabeth O'Connor, a special agent with the Drug Enforcement Administration, testified at trial to statements made by Johnson at the various proffer sessions.[5] She stated that Johnson disclosed that "[i]n early 2001 he returned to New York from North Carolina" and began selling narcotics in "the vicinity of 214 Schaffer [sic]." *Id.* at 174.[6] Johnson reported that "[i]nitially, he sold heroin," but "because crack was more profitable," he soon started selling that drug. *Id.* Johnson explained that, for a time, he and Leotha Barrow sold crack together, but because his sales exceeded Barrow's, Johnson decided to operate on his own. Agent O'Connor testified that Johnson blamed Barrow for his arrest "because there was one occasion where [authorities] sent an informant to purchase crack from Barrow, Barrow didn't have any, Barrow directed the [informant] to go to the defendant and the [informant] did that and purchased crack cocaine." *Id.* Agent O'Connor further stated that, in the course of the debriefings, Johnson admitted that his nickname was "50 Cal" and identified the informant to whom he sold drugs as "Carvin Skidmore." *Id.* at 174–75. At no point in the debriefings did Johnson mention the name "Jamal Barrow," nor did he ever tell authorities that they had "the wrong man." *Id.* at 174–76.

## II. *Discussion*

### A. *The Admission of Johnson's Proffer Statements*

### 1. *The Rule 410 Exception to Admissibility*

Johnson asserts that the admission of his proffer statements into evidence violat-

---

4. In fact, counsel did not make this argument in summation.

5. In response to a question on cross-examination about the "main focus" of the proffer sessions, Agent O'Connor stated: "Our main focus [was] to get [Johnson] to admit everything that he did and then secondary to get him to admit who he is buying from and selling to." Trial Tr. at 181.

6. On appeal, Johnson notes that there is a possible inconsistency in his proffer statement as to whether he returned to New York in early 2001 or in the summer of that year. *See* Appellant's Br. at 32. It does not appear that this fact was ever brought to the attention of the district court in arguing against admission of his statement. Nor was the inconsistency elicited at trial for jury consideration.

ed Rule 410 of the Federal Rules of Evidence. That rule states, in pertinent part:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> (1) a plea of guilty which was later withdrawn;
>
> (2) a plea of nolo contendere;
>
> (3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either of the foregoing pleas; or
>
> (4) *any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.*

Fed.R.Evid. 410 (emphasis added); *see also* Fed.R.Crim.P. 11(f) ("The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410."). The underlying purpose of Rule 410 is to promote plea negotiations by permitting defendants to talk to prosecutors without sacrificing their ability to defend themselves if no disposition agreement is reached. *See* Fed.R.Evid. 410 Advisory Committee's Note (1972). Statements made by defendants in proffer sessions are covered by Rule 410. *See United States v. Velez*, 354 F.3d 190, 194 (2d Cir.2004).

Because Rule 410 is an exception to the general principle that all relevant evidence is admissible at trial, *see* Fed.R.Evid. 402, its limitations are "not to be read broadly," *see United States v. Griffith*, 385 F.3d 124, 126 (2d Cir.2004) (narrowly construing 18 U.S.C. § 3153, which limits admissibility of defendant's statements to pretrial-services

officer). Moreover, its protections are waivable. *See United States v. Mezzanatto*, 513 U.S. 196, 205, 210, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995) (holding that Rule 410, in effect, creates " 'a privilege of the defendant,' and, like other evidentiary privileges, this one may be waived or varied at the defendant's request" (quoting 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 410[05], at 410–43 (1994))); *accord United States v. Velez*, 354 F.3d at 195 (approving broad waiver similar to the one here at issue); *United States v. Rebbe*, 314 F.3d 402, 407 (9th Cir.2002); *United States v. Krilich*, 159 F.3d 1020, 1024–25 (7th Cir.1998). Because Johnson conditionally waived the protections of Rule 410 in his proffer agreement, our focus on this appeal is on the construction of that waiver.

### 2. *Johnson's Proffer Agreement Waiver*

The waiver provision here at issue permits the government to use Johnson's proffer statements "to rebut any evidence offered or elicited, or factual assertions made, by or on behalf of [him] at any stage of a criminal prosecution." Johnson does not challenge the validity of this proffer agreement waiver. *See United States v. Mezzanatto*, 513 U.S. at 210, 115 S.Ct. 797 (holding that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of [Rule 410] is valid and enforceable"); *accord United States v. Velez*, 354 F.3d at 196 (holding that waiver of Rule 410 protection does not violate defendant's right to present a defense, to the assistance of counsel, or to a fair trial, because "a defendant remains free to present evidence inconsistent with his proffer statements, with the fair consequence that, if he does, 'the Government [is] then ... permitted to present the defendant's own

words in rebuttal' " (quoting *United States v. Gomez,* 210 F.Supp.2d 465, 476 (S.D.N.Y.2002))). Nor does he complain because his proffer statements were admitted in the government's case-in-chief rather than in its rebuttal case. *See United States v. Mezzanatto,* 513 U.S. at 211, 115 S.Ct. 797 (Ginsburg, J., concurring, with O'Connor and Breyer, JJ.) (questioning whether use of proffer statements in government's case-in-chief might "more severely undermine a defendant's incentive to negotiate, and thereby inhibit plea bargaining").[7] Instead, Johnson submits that the district court erred in concluding that his counsel's trial conduct triggered the waiver clause of his proffer agreement. He insists that only a specific or direct contradiction between his proffer statement and an assertion by counsel has this effect. *See* Appellant's Reply Br. at 7. We disagree.

 In considering Johnson's argument, we engage in a two-part analysis. We first look at the terms of his proffer agreement waiver to see if it is fairly construed as narrowly as Johnson urges. The agreement is, after all, a contract that must be interpreted "to give effect to the intent of the parties." *See United States v. Liranzo,* 944 F.2d 73, 77 (2d Cir.1991) (internal quotation marks omitted). Be-

cause the interpretation of a contract is generally a question of law, we review this first issue *de novo. Id.; accord Rubens v. Mason,* 387 F.3d 183, 188 (2d Cir.2004). If we conclude that the proffer agreement waiver does apply in this case, our second step is to review for abuse of discretion the district court's evidentiary rulings admitting particular parts of Johnson's proffer statements, *see Old Chief v. United States,* 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *accord United States v. Schultz,* 333 F.3d 393, 415 (2d Cir.2003), *cert. denied,* 540 U.S. 1106, 124 S.Ct. 1051, 157 L.Ed.2d 891 (2004), and we will not reverse unless an error affects a "substantial right," Fed.R.Evid. 103(a). An evidentiary error affects substantial rights only if we conclude that it had a "substantial and injurious effect or influence" on the jury's verdict. *United States v. Dukagjini,* 326 F.3d 45, 61–62 (2d Cir.2003) (internal quotation marks omitted).

a. *The Proffer Agreement Waiver Is Not Limited to Direct Contradictions but Extends to Any Proffer Statement that Fairly Rebuts a Factual Assertion Made on Johnson's Behalf*

 "Where the language of a contract is unambiguous, the parties' intent is dis-

---

7. We are not convinced that the admission of proffer statements in the government's case-in-chief necessarily constitutes error. As the Seventh Circuit observed in *United States v. Krilich,* 159 F.3d at 1025, a defendant can open the door to introduction of proffer statements as easily on the government's case-in-chief—for example, through cross-examination of a prosecution witness—as on his own case. In the former circumstance, and where the defendant rests without presenting direct evidence, the only opportunity the government will have to rebut the evidence elicited on cross-examination will be on its direct case. Thus, the critical issues for purposes of determining admissibility should be whether defendant's waiver does explicitly apply, as in this case, to "any stage" of his prosecution,

and whether he has, in fact, triggered that waiver. If these questions are fairly answered in the affirmative, and if the evidence is otherwise admissible, the question of when in the course of trial the proffer statements should be presented to the jury is a matter sensibly left to the sound discretion of the trial judge. *See Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (recognizing need to afford trial judge broad discretion to "determine generally the order in which parties will adduce proof"); *cf. United States v. Bok,* 156 F.3d 157, 166 (2d Cir.1998) (recognizing district court discretion to admit similar act evidence during government's case-in-chief rather than on rebuttal where it is apparent that defendant will dispute issue of intent).

cerned from the four corners" of their agreement. *United States v. Liranzo*, 944 F.2d at 77 (and cases cited therein); *accord Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir.2004). The proffer agreement here at issue uses unambiguous language to identify (1) the conduct that can trigger waiver: the offer of "any evidence . . . or factual assertions made, by or on behalf of [Johnson]"; (2) the purpose for which the waiver permits use of proffer statements: "to rebut"; and (3) the proceedings at which the waiver is applicable: "any stage of a criminal prosecution." Because Johnson's argument does not depend on the last phrase, we focus our discussion on the first two.

### (1) *The Factual Assertions Triggering Waiver*

The waiver's triggering language unambiguously expresses the parties' intent to create an expansive waiver, applying to "any evidence," whether offered directly or elicited on cross-examination. *See generally Department of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 131, 122 S.Ct. 1230,

152 L.Ed.2d 258 (2002) (noting that when used in a statute, " 'the word "any" has an expansive meaning' " (quoting *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997))). Further indicative of the parties' expansive intent is their extension of the waiver beyond formally admitted evidence to "any . . . factual assertions" made by Johnson or on his behalf at any stage of the prosecution. *See Collazos v. United States*, 368 F.3d 190, 199 (2d Cir.2004) ("[W]hen, as here, the two words at issue are connected by 'or' rather than 'and,' and when no commas set off the second word to suggest that it stands in apposition to the first, we construe the disjunctive words to convey different meanings."). Factual assertions made by a defendant's counsel in an opening argument or on cross-examination plainly fall within this broad language.[8]

■ The mere fact that a defendant pleads not guilty and stands trial is not a factual assertion that triggers the proffer agreement waiver, and the government certainly does not contend otherwise. *See United States v. Krilich*, 159 F.3d at 1025.

---

8. We note that the agreement in this case is more expansive than that at issue in *United States v. Krilich*, which applied only if the defendant "testif[ied] *contrary* to the substance of the proffer" or "present[ed] a position *inconsistent* with the proffer." 159 F.3d at 1024 (emphasis added). We decline Johnson's invitation to read an "inconsistency" requirement into the triggering phrase of his agreement, *see John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir.1994) ("When parties have entered into an unambiguous contract, the court should look to the terms expressed in the contract itself rather than to extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." (internal quotation marks omitted)), and, as a result, we need not decide whether we agree with the Seventh Circuit's conclusion that "[s]tatements are inconsistent only if the truth of one implies the falsity of the

other," *United States v. Krilich*, 159 F.3d at 1025–26.

We do note, however, that in *United States v. Trzaska*, we observed that under Fed. R.Evid. 613, two statements did not need to be "diametrically opposed" to be inconsistent. 111 F.3d 1019, 1024 (2d Cir.1997) (quoting *United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir.1988)). In *Trzaska*, we cited approvingly to treatises stating that two statements are inconsistent if there is "[a]ny variance between the statement and the testimony that has a *reasonable bearing on credibility*," *id.* at 1025 (quoting Charles Alan Wright & Victor James Gold, 28 Federal Practice and Procedure § 6203, at 514 (1993)), or if the jury could "reasonably find that a witness who believed the truth of the facts testified to would have been unlikely to make a . . . statement of this tenor," *id.* (quoting John W. Strong *et al.*, 1 McCormick on Evidence § 34, at 115 (4th ed.1992)).

Nor are defense arguments that attempt to demonstrate why the facts put in evidence by the prosecution are insufficient to permit the jury to find the elements of the crime proved. Thus, a defense argument that simply challenged the sufficiency of government proof on elements such as knowledge, intent, identity, etc., would not trigger the waiver here at issue. On the other hand, a statement of fact in a defense opening, such as the statement in this case unequivocally identifying Jamal Barrow as the real perpetrator of the charged crimes, does qualify as a factual assertion within the four corners of the waiver provision. Thus, we conclude that the waiver's "factual assertion" requirement was satisfied in this case.

We note, however, that such a conclusion may not be reached so easily when counsel's arguments or questions assert facts implicitly rather than directly. For example, a cross-examination question challenging a witness's perception or recollection of an event does not necessarily imply that the event did not occur, only that the witness may not have seen or reported it accurately. On the other hand, a question accusing a witness of fabricating an event, such as counsel in this case put to Det. Campana with respect to the April 19, 2001 meeting with the confidential informant, does implicitly assert that no such meeting ever took place. Thus, when confronted with a government argument that a defense opening or cross-examination implicitly satisfies the factual assertion requirement for waiver, a district court may well have to consider carefully what fact, if any, has actually been implied to the jury before deciding whether proffer statements fairly rebut it.

We further note that even when a district court is satisfied that a factual assertion triggering a Rule 410 waiver has been made, whether directly or implicitly, that conclusion does not mandate receipt of the proffer statements in evidence. A waiver agreement between the parties does not divest a district court of its considerable discretion to exclude relevant evidence that may inject "unfair prejudice" or "confusion" into the jury's resolution of the issues in dispute. Fed.R.Evid. 403; see, e.g., United States v. Flaharty, 295 F.3d 182, 190–91 (2d Cir.2002). Thus a court may well view a factual assertion made by counsel at sentencing, where parties frequently proceed by proffer, see, e.g., United States v. Dillon, 351 F.3d 1315, 1317 (10th Cir.2003); United States v. Mayberry, 272 F.3d 945, 948 (7th Cir. 2001); United States v. Marmolejo, 139 F.3d 528, 531 (5th Cir.1998), differently from the same assertion made in an opening statement or a question to a trial witness. Counsels' questions and arguments at trial are not, after all, evidence, see United States v. Arboleda, 20 F.3d 58, 61 (2d Cir.1994); see also 4 Leonard B. Sand et al., Modern Federal Jury Instructions, Instruction 74–1 (2004) ("[T]he question of a lawyer is not to be considered by you as evidence.... Arguments by lawyers are not evidence, because the lawyers are not witnesses."), and district courts may, in appropriate cases, decide to strike a question or argument, instructing the jury to ignore the factual assertion stated or implied, rather than admit defendant's proffer statements in rebuttal. The exercise of such discretion necessarily depends on the district court's unique insights into trial dynamics and into the impact the assertions at issue have had on the jury. For example, a district court might exercise its discretion to exclude proffer statements when it concludes that a "factual assertion" was inadvertently and only briefly interjected into the proceedings, and counsel agrees not to pursue the matter further. Cf. United States v. Sampson, 385 F.3d 183, 193 (2d Cir.2004) ("A defendant

may completely forestall the admission of other act evidence on the issue of intent by expressing a decision not to dispute that issue with sufficient clarity . . . ." (alterations and internal quotation marks omitted)).

That, however, is not this case. The factual assertion implied by defense counsel's cross-examination—that the undercover officer had fabricated, in whole or in part, events underlying the April 19, 2001 charge—reinforced the unequivocal factual assertion in the opening statement that Jamal Barrow was the real perpetrator of the charged crimes. Under these circumstances, the district court had no reason to pursue alternatives to the introduction of the proffer statements. It properly concluded that Johnson's counsel had triggered the factual assertion requirement for waiver.

### (2) The Permissible Scope of Rebuttal

■ Where evidence has been adduced or the requisite factual assertions made, the waiver provision states that the single purpose for which the defendant's proffer statement may be used is "to rebut." The word "rebut" has a common meaning, which is certainly well understood by trial courts and trial lawyers. To "rebut" means "to contradict, meet, or oppose by formal legal argument, plea, or countervailing proof." *Webster's Third New International Dictionary Unabridged* 1893 (1993). *Black's Law Dictionary* 1274 (7th ed.1999), defines the term as "[t]o refute, oppose, or counteract (something) by evidence, argument, or contrary proof."

While direct contradiction certainly falls within the scope of these definitions, it is not the only means by which evidence or assertions may be refuted, opposed, or counteracted. As we observed in *United States v. Hiss*, "what is within the scope of permissible contradiction is largely a matter of avoiding confusion of issues, and as such should be left to the discretion of the trial judge." 185 F.2d 822, 832 (2d Cir. 1950). Indeed, precisely because rebuttal is necessarily a flexible concept and because trial judges are uniquely situated to assess the impact certain evidence or arguments have made on a jury, "we are disinclined to overturn a district judge, who has determined—after watching a case unfold—that testimony properly rebuts an inference that a party's adversary has sought to make." *United States v. Tejada*, 956 F.2d 1256, 1267 (2d Cir.1992); *accord United States v. Casamento*, 887 F.2d 1141, 1171–72 (2d Cir.1989); *see also FDIC v. Suna Assocs., Inc.*, 80 F.3d 681, 687–88 (2d Cir.1996).

Case law confirms that proper rebuttal is not limited to direct contradiction. In *United States v. Casamento*, a defendant testified that he worked as a precious stones broker, thereby "implicitly . . . den[ying] that he had any connection to [the charged] narcotics trafficking." 887 F.2d at 1172. To rebut this implication, the trial judge allowed the prosecution to offer evidence that defendant's name and telephone number had been found on a person from whom officers seized six kilograms of cocaine. Although the seized evidence did not directly contradict defendant's testimony as to his employment, we affirmed, ruling that linking the defendant to a drug trafficker "who clearly was involved both in importing activities and drug trafficking," was proper rebuttal. *Id.*

Other cases similarly admit rebuttal evidence involving no direct contradiction. In *United States v. Ruffin*, 575 F.2d 346, 357 (2d Cir.1978), a tax evasion case, we affirmed the district court's decision to admit evidence showing that certain corporate expenditures had been used to buy defendant a mortgage. Although the evidence did not directly contradict any particular

proof, we concluded that it did "rebut directly Ruffin's defense of insubstantial tax liability." *Id.* at 357. In *United States v. Bari*, 750 F.2d 1169, 1180 (2d Cir.1984), we ruled that an opening statement suggesting that defendant's injuries rendered his charged attempted escape improbable opened the door to rebuttal evidence of a different—and, therefore, not directly contradictory—escape attempt defendant made while suffering from a different physical disability. In *United States v. Khan*, 787 F.2d 28, 34 (2d Cir.1986), a drug smuggling case in which defense counsel told the jury that it would hear no evidence of defendant' s wealth, we approved expert testimony about how inexpensively heroin could be purchased in Pakistan. Plainly, the evidence did not rebut the argument that defendant was not a wealthy man, but it did rebut the inference that a lack of means would have prevented him from committing the charged crime. *Id.* Finally, in *United States v. Kusek*, 844 F.2d 942, 948 (2d Cir.1988), another drug case, defense counsel opened by alluding to a large cash seizure from his client's home and stated that his client owned a restaurant that generated large sums of cash.[9] The district court concluded that this suggestion of a legitimate source for the money was properly rebutted with evidence of defendant's post-arrest disavowal of any knowledge of the seized cash, *id.*, although the latter statement certainly did not disprove defendant's restaurant ownership.

This precedent demonstrates that "rebuttal" is hardly limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary. We must assume that when the parties in this case signed a proffer agreement with a waiver provision that used the word "rebut," they intended that word to bear this commonly understood meaning. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 140 (2d Cir.2000) (observing that "the words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning" (internal quotation marks omitted)). Accordingly, we reject Johnson's argument that the district court was obliged to construe his waiver to apply only to proffer statements that directly contradicted his counsel's factual assertions. Once defense counsel's factual assertions in opening and cross-examination triggered the proffer agreement's waiver of Rule 410, the district court enjoyed the same broad discretion to admit Johnson's proffer statements that it would have with respect to any other rebuttal evidence.

### b. *The District Court's Admission of Johnson's Proffer Statements*

Because we conclude that there was no legal error in the interpretation of the waiver agreement in this case, we review the district court's evidentiary rulings admitting particular proffer statements to rebut defense counsel's factual assertions only for abuse of discretion. *See United States v. Schultz*, 333 F.3d at 415; *United States v. Tejada*, 956 F.2d at 1267.

■ Focusing first on those statements received with respect to Johnson's crack dealing, we conclude that, even if Johnson's failure to reference dates in his proffer statements precludes a finding of direct contradiction between these statements and counsel's factual assertions, common

---

**9.** The issue on appeal in *Kusek* concerned discovery provided by the government under Fed.R.Crim.P. 16(a)(1)(A). We cite the case here for its analogous facts.

sense nevertheless compels the conclusion that these proffer statements and the circumstances surrounding their making cast serious doubt on the truth of counsel's assertion that Jamal Barrow was the real perpetrator of the charged crimes and that Det. Campana fabricated the events of April 19, 2001. When Johnson voluntarily sat down for three proffer sessions with the federal authorities who were prosecuting him for crack trafficking, he knew the exact dates, places, and general circumstances pertaining to each charged sale. Under these circumstances, it is unlikely in the extreme that, when he admitted regular crack trafficking at the locations charged throughout the time charged, he was referring to sales other than those specified in the complaint and first superseding indictment. Certainly, at no time during the proffer sessions did Johnson ever state that his admissions pertained to dates other than those charged. Nor did he ever suggest that someone else was responsible for the charged crack sales. To the contrary, he attributed his arrest to events that paralleled those involved in the April 19, 2001 charge.[10] Moreover, although his proffer statement identifies a host of other persons involved in drug trafficking, he never mentioned Jamal Barrow.[11] Because the proffer statements thus fairly (and convincingly) cast doubt on the truthfulness of counsel's assertions that Jamal Barrow, and not Calvin Johnson, had committed each and every one of the charged crack crimes, and

that the events of April 19, 2001, were fabricated by the undercover officer, we conclude that the district court acted well within its discretion in admitting Johnson's proffer statements to rebut counsel's factual assertions.

■ Johnson attempts to draw a distinction between prosecution questions eliciting what he actually said in his proffer statements and those eliciting what he did not say. We conclude that the district court acted within its discretion in allowing both. Omissions from Johnson's proffer statements enjoy no Fifth Amendment protection. Unlike an arrestee who has a right to remain silent and who has ordinarily been advised of this right, see Doyle v. Ohio, 426 U.S. 610, 617–18, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); United States v. Hale, 422 U.S. 171, 177, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), Johnson voluntarily agreed to speak with government officials in pursuit of a possible cooperation agreement. He understood that the purpose of his proffer sessions was for him fully to disclose his own drug dealing as well as that of other persons known to him. Under these circumstances, a jury could fairly infer that "the accused would be more likely than not to dispute an untrue accusation," United States v. Hale, 422 U.S. at 176, 95 S.Ct. 2133, and that Johnson's failure to disavow drug dealing on the charged dates, or to attribute those crimes to Jamal Barrow, could reasonably be understood as an admission to the charged

10. In his reply brief, Johnson argues that his account more closely resembles the complaint's description of the April 26, 2001 transaction than its description of the April 19, 2001 transaction. See Appellant's Reply Br. at 12–13. Only the latter was the subject of a substantive charge at trial. We note that this argument does not appear to have been presented to the district court, and the conclusion urged by counsel is not so ineluctable that the district court's failure to discern it independently constitutes error, let alone

plain error. See United States v. Vasquez, 267 F.3d 79, 89–90 (2d Cir.2001).

11. The district court did not allow Johnson's proffer statements identifying other traffickers to come before the jury, but it was presumably aware that he had made such disclosures when it ruled that the government could elicit that Johnson had made no mention of Jamal Barrow in his proffer statements.

crimes. In sum, what Johnson failed to say in the proffer sessions was properly received in evidence because it reinforced the conclusion that what he did say rebutted his attorney's trial assertions. *See Anderson v. Charles,* 447 U.S. 404, 408–09, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) *(per curiam )* (holding that impeachment with prior inconsistent statements may highlight omission of certain facts from defendant's earlier version of events); *United States v. Strother,* 49 F.3d 869, 875 (2d Cir.1995) (holding that memorandum omitting fact to which witness testified at trial should have been admitted as an inconsistent statement because "[i]t would have been 'natural' for [the witness] to include" the fact in the memorandum).

■ In testifying to Johnson's statements about crack trafficking, DEA Agent O'Connor volunteered that Johnson also admitted selling heroin, a statement not previously approved by the district court. Johnson objected at trial to all. of the government's proffer statement evidence, but he did not then cite the heroin testimony as especially problematic. Nonetheless he points to this conduct on appeal as illustrative of prosecution over-reaching. The argument warrants little discussion. At trial, Johnson virtually conceded the charged heroin sale, seemingly ridiculing the prosecution for pursuing a trivial transaction. *See* Trial Tr. at 24 ("The sale of heroin in total is 2.5 grains .... [W]e are not talking about grams or ounces but 2.5 grains is about the same amount as the grain of rice, maybe even less."). Thus, if Johnson's heroin admission should not have been elicited because there was no factual assertion to rebut, it also follows that this evidentiary error was harmless because it did not affect his substantial rights. *See United States v. Dukagjini,* 326 F.3d at 61–62.

In sum, we reject Johnson's argument that his proffer agreement waiver applied only to statements that directly contradicted his attorney's factual assertions in his opening statement and cross-examination. The waiver language is fairly construed to apply to any proffer statements that could fairly rebut those factual assertions, and the district court did not abuse its discretion in admitting proffer statements relating to crack dealing for this purpose. To the extent a different conclusion may be warranted with respect to a proffer statement relating to heroin, any evidentiary error was harmless.

**B.** *The Expert Witness Testimony*

Johnson asserts that the district court erred in allowing New York City Detective Patricia Rodriguez to testify as an expert witness because (1) expert testimony was unnecessary in this case, and (2) the witness's status as an expert unfairly enhanced her credibility as a fact witness. We find neither objection convincing.

**1.** *The Decision to Admit Expert Testimony*

■ Rule 702 of the Federal Rules of Evidence provides that where "scientific, technical, or other specialized knowledge will assist the trier of fact," an expert witness possessing such knowledge "may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." We review a district court's qualification of an expert witness, as well as its admission of that witness's testimony, for abuse of discretion, and we will sustain its rulings unless they are "manifestly erroneous." *United States v. Cruz,* 363 F.3d 187, 192 (2d Cir.

2004) (internal quotation marks omitted) (and cases cited therein); *United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir.2000); *United States v. Russo*, 74 F.3d 1383, 1394 (2d Cir.1996).

As this court has frequently recognized, expert testimony from a law enforcement official can assist a jury in a narcotics case to understand the general operating methods of the illicit drug trade and to interpret case-specific evidence. *See United States v. Dukagjini*, 326 F.3d at 52; *United States v. Boissoneault*, 926 F.2d 230, 232–33 (2d Cir.1991) (collecting cases). Although the transactions here at issue may seem straightforward, even commonplace, to those who routinely deal with drug cases, we are not yet convinced that every person sworn to serve on a federal jury understands the relationship between crack and powder cocaine, or the different methods employed by drug dealers operating at various levels of the distribution chain. To the extent the district court allowed Agent Rodriguez to testify briefly about such matters, we find no manifest error in its decision.

2. *Allowing Det. Rodriguez to Testify as Both a Fact and Expert Witness*

■ Although this court has frequently cautioned as to the risks presented by allowing a law enforcement officer to testify as both a fact and an expert witness, *see, e.g., United States v. Cruz*, 363 F.3d at 194–97; *United States v. Dukagjini*, 326 F.3d at 54–56, we have not categorically prohibited the practice, *see United States v. Feliciano*, 223 F.3d at 121 (stating that "dual testimony is not objectionable in principle"). Instead, we have urged district courts to exercise particular vigilance to ensure that the witness's dual role does not impair the jury's ability properly to evaluate credibility. *See United States v. Cruz*, 363 F.3d at 195; *United States v.*

*Dukagjini*, 326 F.3d at 54. Specifically, a court must ensure that the reliability of the witness's expert opinions is not improperly enhanced by a jury's assumption that the witness has knowledge of the defendant's activities that goes "beyond the evidence at trial." *United States v. Dukagjini*, 326 F.3d at 53 (quoting *United States v. Young*, 745 F.2d 733, 766 (2d Cir.1984) (Newman, J., concurring)). Similarly, a witness's status as an expert cannot be allowed to enhance his credibility as a fact witness, particularly if he testifies to "facts" in broad, general terms, without the specifics necessary to proper jury evaluation. *See United States v. Feliciano*, 223 F.3d at 121.

■ A review of the record demonstrates that Det. Rodriguez's testimony did not present these concerns. Her expert testimony was brief and related only to a few general practices of street-level drug dealers, none of which was in dispute in this case. Her testimony as to facts pertinent to this particular case was also brief and, more to the point, sufficiently separate and distinct from her expert testimony to raise no concern that the line between the two would be "hard to discern." *Id.* The single area where her credibility as a fact witness was challenged related to how and when she learned that the crack seller under investigation was named "Cal" rather than "Kyle," as she had noted in a case report. This discrepancy raised a question about the accuracy of the witness's memory wholly unrelated to her testimony about street-level narcotics dealing. On cross-examination, Johnson's counsel vigorously tested the accuracy of Det. Rodriguez's memory on the disputed point. Under these circumstances, we are satisfied that the jury could properly assess the witness's credibility, and we find no manifest error in the district court's decision to allow the officer

to testify as both a fact and an expert witness.

### III. *Conclusion*

For the reasons stated, we conclude:

1. Defense counsel's factual assertions at trial triggered the waiver provision of Johnson's proffer agreement, permitting the government to offer Johnson's proffer statements in rebuttal. Because we reject Johnson's argument that rebuttal is limited to direct contradiction, we conclude that the district court acted within its discretion in ruling that the challenged statements constituted fair rebuttal.

2. The district court acted within its discretion in permitting the same law enforcement officer to testify briefly as both a fact and an expert witness.

The judgment of the district court is AFFIRMED.