15-958-cr(L)
*United States v. Lyle & Van Praagh*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2016

Argued: January 12, 2017
Final Submission: July 6, 2018
Decided: April 1, 2019

Docket Nos. 15-958-cr(L), 15-1175-cr(CON)

UNITED STATES OF AMERICA,

*Appellee,*

v.

JAMES LYLE, AKA SEALED DEFENDANT 3, MICHAEL VAN PRAAGH, AKA SEALED
DEFENDANT 1,

*Defendants-Appellants,*

ANTHONY TARANTINO, AKA SEALED DEFENDANT 2,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

RAGGI, CHIN, AND LOHIER, *Circuit Judges.*

Consolidated appeals from judgments of the United States District Court for the Southern District of New York (Crotty, *J.*) entered after defendants-appellants James Lyle and Michael Van Praagh were convicted at trial of charges relating to drug trafficking. Lyle challenges the admission of (1) physical evidence obtained pursuant to warrantless searches and (2) his post-arrest and proffer statements. Van Praagh challenges (1) the sufficiency of the evidence of conspiracy, (2) the admission of Lyle's post-arrest and proffer statements in their joint trial, and (3) the reasonableness of his sentence.

AFFIRMED.

MICHAEL FERRARA, Assistant United States Attorney (Brendan F. Quigley, Assistant United States Attorney, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

DANIEL S. NOOTER (Thomas H. Nooter, *on the brief*), Freeman Nooter & Ginsberg, New York, New York, *for Defendant-Appellant James Lyle.*

MARSHA R. TAUBENHAUS, Law Offices of
Marsha R. Taubenhaus, New York, New
York, *for Defendant-Appellant Michael Van
Praagh.*

CHIN, *Circuit Judge*:

Defendants-appellants James Lyle and Michael Van Praagh appeal from judgments of the United States District Court for the Southern District of New York (Crotty, *J.*) convicting them on charges relating to the distribution of methamphetamine. Lyle challenges the admission at trial of evidence seized during a December 11, 2013 inventory search of a rental car and a January 9, 2014 search of his hotel room. He also challenges the admission at trial of certain post-arrest and proffer statements. Van Praagh challenges the sufficiency of the evidence of his participation in a methamphetamine distribution conspiracy, the admission of Lyle's post-arrest and proffer statements in their joint trial, and the reasonableness of his sentence. Because we conclude that the evidence at trial was sufficient to support all convictions, the challenged searches and seizures did not violate the Fourth Amendment, the admission of Lyle's statements did not violate the Fifth Amendment, and Van Praagh's sentence was reasonable, we affirm the judgments of the district court.

3

## BACKGROUND

**I.** *The Facts*

Because Van Praagh and Lyle appeal convictions following a jury trial, we view the evidence in "the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor." *United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016) (quoting *United States v. Dhinsa*, 243 F.3d 635, 643 (2d Cir. 2001)).

**A.** *Overview*

Throughout 2013, Van Praagh regularly sold pound quantities of methamphetamine. These deals generally occurred once a week and often took place in Manhattan hotels. Van Praagh also sold smaller quantities of methamphetamine out of his apartment in Queens and through in-person deliveries to his customers. Brandon Hodges, an Arizona-based methamphetamine supplier, sent Van Praagh methamphetamine on three or four occasions during this time, with the largest shipment containing four ounces of methamphetamine. Van Praagh regularly sold methamphetamine to Lyle, who was also a methamphetamine dealer in the New York area. Lyle regularly sold methamphetamine to Anthony Tarantino. Tarantino initially purchased

4

methamphetamine for personal use, but eventually started selling small quantities of methamphetamine to his own clients. Both Hodges and Tarantino cooperated with the government and testified at trial.

In January 2013, Lyle introduced Tarantino to Van Praagh. Tarantino accompanied Lyle to Van Praagh's apartment so that Lyle could restock his methamphetamine supply. While at Van Praagh's apartment, Tarantino saw Lyle purchase methamphetamine from Van Praagh, which Lyle later sold to Tarantino. In April 2013, Lyle took Tarantino to Van Praagh's apartment a second time, where Tarantino again observed Lyle "re-up," *i.e.*, purchase methamphetamine, from Van Praagh. After this second visit, Tarantino and Van Praagh became romantically involved, and eventually Tarantino moved in with Van Praagh and began helping him sell methamphetamine.

B.      *The Seizure of Methamphetamine from Van Praagh's Hotel Room*

On May 29, 2013, Van Praagh and Tarantino checked into the Out Hotel in midtown Manhattan. That night, they sold pound quantities of methamphetamine to several customers, including Lyle. The next day, they checked out of the hotel but accidentally left approximately a pound of

5

methamphetamine and $20,000 cash in the hotel room safe. Hotel staff found the drugs and money and called the New York City Police Department ("NYPD"), and officers arrived to seize the drugs and cash. After Van Praagh realized his mistake later that day, he returned to the hotel, where he was arrested by the NYPD. During the arrest, the officers seized a cellular phone and over $1,000 cash from Van Praagh's pocket. The officers also searched Van Praagh's Vespa scooter parked outside the hotel, where they found part of and packaging for a digital scale.

Soon thereafter, Tarantino brought Lyle money to give to Van Praagh's father to bail Van Praagh out of jail. The day after Van Praagh got out of jail, he and Tarantino flew to Arizona to ensure that Van Praagh's methamphetamine suppliers would continue to sell to him. Van Praagh and Tarantino returned to New York and continued their sale of methamphetamine.

C.    *Lyle's Arrests*

On December 11, 2013, NYPD officers observed Lyle park and exit a car in midtown Manhattan. The officers noticed a knife clipped to Lyle's pants, which they later determined to be an illegal gravity knife. The officers approached Lyle as he was closing the trunk of the car. Lyle told the officers that

6

he was legally permitted to carry a gravity knife because he was a member of the stagehands union and used the knife to perform his job. Lyle initially said he had not driven the car but when the officers informed him that they had seen him driving it, Lyle admitted as much. When asked for identification, Lyle produced a New York State ID with the expiration date scratched off. The officers confirmed that Lyle's driver's license was suspended. The officers also determined that the vehicle Lyle was driving was a rental car and that Lyle was not an authorized driver under the rental agreement. Lyle claimed that his girlfriend had rented the car and had given him permission to drive it. The officers arrested Lyle for driving with a suspended license and for possessing an illegal knife.

Before heading to the station for processing, Lyle asked if the car could be left at the location and stated that his girlfriend would pick it up. The officers denied the request and impounded the vehicle. At the police precinct, an inventory search was conducted. Over one pound of methamphetamine and approximately $39,000 cash were found in the trunk of the car.

The following day -- December 12, 2013 -- Lyle was brought to the District Attorney's Office where he made certain statements in custody after

7

being read his *Miranda* rights. When asked about the methamphetamine that was in the trunk of the rental car, Lyle stated that "an individual . . . had contacted him and asked him to hold something for him." Tr. 435.[1] He stated that upon meeting with that individual and another individual, he stayed in the car and did not see what was placed in the trunk but presumed it to be drugs because the individual that he was meeting with was known to distribute large quantities of methamphetamine in the New York area. When asked about his relationship with these two individuals, Lyle stated that he was friends with them, and had eventually begun working with one of them in delivering methamphetamine to the individual's customers.

Lyle stated that the person in charge had a source of supply in Arizona named either Brendan or Brandon. Lyle also "provided a few names" of other people in the New York area who distributed large quantities of methamphetamine. Tr. 436.

On January 9, 2014, police in East Windsor, New Jersey responded to an anonymous call that people were using methamphetamine in a hotel room.

---

[1] Lyle identified this individual as Van Praagh, but at trial, "individual" was substituted for Van Praagh's name pursuant to *Bruton v. United States*, 391 U.S. 123 (1968).

When they got to the hotel room, Lyle opened the door and invited the officers inside. The officers heard the toilet flush and saw Lyle's girlfriend come out of the bathroom. The officers observed a torch lighter on the bathroom shelf, a small clear bag next to the trash can, and a partial clear straw wrapper containing white residue on the bathroom floor. Additionally, they observed a towel under the bathroom doorway. In the bedroom, the officers noticed that a clear bag had been affixed to the smoke detector with rubber bands.

Officers then performed a consent search of the room, and found approximately fourteen grams of methamphetamine, $3,270 cash, a digital scale, and numerous plastic baggies. Lyle and his girlfriend were both arrested.

## II. *The Proceedings Below*

### A. *The Indictment and Van Praagh's Arrest*

Van Praagh, Lyle, and Tarantino were indicted on March 20, 2014. On March 31, 2014, Drug Enforcement Administration ("DEA") agents arrested Van Praagh at his apartment. After receiving consent to search the apartment, agents found tools used to sell drugs, including a heat-sealer, packaging materials, and multiple scales, and a note from Hodges asking Van Praagh to have Lyle call him.

9

On April 6, 2013, Van Praagh called his father from jail and told him, in a recorded call, "they got nothing . . . .  I sterilized the house like I told you." Supp. App. 104.  He also told him, "[t]hey got Anthony [Tarantino], but I'm expecting that he'll be disappearing any day now . . . .  I believe that he had been talking."  Supp. App. 105.

### B.     *Lyle's Proffer Session*

On April 7, 2014, Lyle participated in a proffer session with the government in hope of reaching a cooperation agreement.  A proffer agreement was executed, stipulating that the government would not use any of Lyle's statements made during the proffer sessions against him, except "to rebut any evidence or arguments offered by or on behalf of [Lyle]."  Lyle App. 36.

During the proffer session, Lyle admitted that (1) around 2011 or 2012, he sometimes stayed with Van Praagh while working on projects in New York City; (2) he observed Van Praagh smoking and using methamphetamine; (3) he occasionally delivered packages to Van Praagh's clients; (4) he accompanied Van Praagh to deliver methamphetamine thirty to fifty times; (5) Van Praagh told Lyle his supplier was in Arizona; and (6) on one occasion,

Lyle accompanied Van Praagh to pick up methamphetamine from a library in New York City.

### C.  *The Superseding Indictment and Pretrial Motions*

A superseding indictment was filed September 30, 2014, charging (1) Van Praagh and Lyle with conspiring to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), from December 2012 to January 2014; (2) Van Praagh with distributing and possessing with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), on or about May 30, 2013; and (3) Lyle with distributing and possessing with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), on or about December 11, 2013.

Before trial, Lyle moved to suppress the physical evidence recovered from the search of the automobile, as well as his subsequent post-arrest statements.  In an affidavit filed in support of the motion, Lyle admitted that (1) just prior to his arrest, he had been driving the car that had been rented by his girlfriend with her permission; (2) he possessed a gravity knife that day; (3) he

11

initially told the police officers he had not been driving the car but later admitted to driving the car; and (4) his license was suspended at the time.

On September 11, 2014, the district court held an evidentiary hearing on the voluntariness of Lyle's post-arrest statements and, on October 1, 2014, the court denied Lyle's motion to suppress. The court found there was probable cause for Lyle's arrest, based on his possession of a gravity knife. The court then concluded that the search of the rental car was justified on two independent bases. First, Lyle had no reasonable expectation of privacy in the rental car because he was not an authorized driver under the rental agreement. Second, the search of the rental car was a valid inventory search. The court also found that Lyle's post-arrest statements were made voluntarily and pursuant to a valid *Miranda* waiver.

### D.    *The Trial*

Lyle and Van Praagh's trial began on October 14, 2014, and ended on October 20, 2014. The government called nineteen witnesses, and introduced physical evidence consisting of drugs and drug processing materials, text messages between the defendants, testimony regarding Lyle's post-arrest and proffer statements, and the recorded call Van Praagh made to his father while

12

incarcerated. Van Praagh called one witness who testified about the circumstances of Van Praagh's March 31, 2014 arrest. Lyle did not put on a case.

During his opening statement, Lyle's counsel stated that "[Lyle] obtained, bought, borrowed, was given methamphetamine for his own use. Where we dispute is the idea that he was a dealer." Tr. 28. Later that day, the government submitted a letter brief, asserting that Lyle's counsel's argument that Lyle was not a dealer opened the door to Lyle's proffer statements about distributing drugs with Van Praagh.

Lyle's statements to law enforcement were admitted in two contexts. First, the district court allowed testimony regarding Lyle's December 12, 2013 post-arrest statements to law enforcement to be admitted only as against him, prohibiting mention of Van Praagh. Van Praagh did not object to the redacted testimony. Government witnesses testified that Lyle admitted that an "individual" for whom he worked as a "runner" "asked him to hold something for him" in the trunk of the rental car, which Lyle "presumed . . . to be drugs" because Lyle knew "[t]hat individual along with another individual" distributed "large quantities of crystal meth in the New York area." Tr. 435, 534. Lyle was friends "[m]ore so with the individual that had not placed the drugs in the

13

trunk. . . . He said that he began as friends, and eventually he began working with that individual" -- the "individual who was in charge"-- "assisting him in delivering . . . methamphetamine to that individual's customers." Tr. 435-36. Lyle told law enforcement that the individuals for whom he was working as a runner had a source of supply in Arizona named either Brendan or Brandon. Lyle also gave law enforcement "a few names" of other people in the New York area who distributed methamphetamine, including the names of three competitor drug dealers. Tr. 436. On cross-examination, Lyle's attorney elicited testimony that, during the post-arrest interview, Lyle "gave names of people during the conversation," one of which was Brandon or Brendan. Tr. 448.

Second, toward the close of the government's case, the district court ruled -- over Lyle's objection -- that Lyle's proffer statements were admissible, but again prohibited mention of Van Praagh. Van Praagh did not object. The government witness then testified that Lyle admitted he had "first become involved in methamphetamine" in 2012 through "someone" he "knew . . . from work." Tr. 517-18. Lyle observed "that person . . . using and distributing crystal methamphetamine." Tr. 518. Lyle "began distributing small packages" for that person and "accompanying that person on deals as well as picking up crystal

14

methamphetamine." *Id.* Lyle admitted that "he accompanied this person . . . [on] between 30 to 50 occasions. And that at one point they had gone to a library in the New York City area . . . to pick up crystal methamphetamine." *Id.* Lyle said the methamphetamine supplier was in Arizona.

On cross-examination, Lyle's attorney elicited from the witness that "[Lyle] actually g[a]ve real names of people" during his proffer session, and provided "some names of people whose last names he didn't know." Tr. 524. These names included "Zaron," "Ted," "Bob," and "Joe." Tr. at 525.

At the close of trial, the district court instructed the jury, in pertinent part: "There has been evidence that Mr. Lyle made statements to law enforcement authorities . . . . I want to let you know that . . . Mr. Lyle's statement about his own conduct may not be considered or discussed by you with regard to Mr. Van Praagh." Tr. 713.

On October 20, 2014, the jury found the defendants guilty on all counts. On March 25, 2015, the district court sentenced Lyle principally to the statutory mandatory minimum of 120 months' imprisonment and, on April 2, 2015, the district court sentenced Van Praagh principally to 144 months' imprisonment. In imposing a higher sentence on Van Praagh, the district court

15

concluded that "Van Praagh had a higher role, more important role.  He dealt in more drugs than did Mr. Lyle."  Van Praagh App. 62.

These appeals followed.  On May 9, 2017, we issued an opinion affirming the district court's judgments.  *United States v. Lyle*, 856 F.3d 191 (2d Cir. 2017).  Lyle petitioned for and was granted certiorari by the Supreme Court.  On May 21, 2018, the Supreme Court vacated the judgment and remanded the case for further consideration in light of its intervening decision in *Byrd v. United States*, --- U.S. ---, 138 S. Ct. 1518 (2018), which addressed the issue of the reasonable expectation of privacy of an unauthorized driver of a rental car.  On July 6, 2018, the parties submitted letter briefs addressing *Byrd*'s impact upon this case.  For the reasons set forth below, we adhere to our original decision.

## DISCUSSION

Six issues are presented: (1) the validity of the warrantless search and seizure of the rental car; (2) the interpretation of Lyle's proffer agreement; (3) the sufficiency of the redactions to Lyle's proffer statements; (4) the admissibility of Lyle's New Jersey arrest; (5) the sufficiency of the conspiracy evidence against Van Praagh; and (6) the reasonableness of Van Praagh's sentence.  We address each issue in turn.

16

**I.    *Warrantless Search of Rental Car***

We review a district court's ruling on a suppression motion for clear error as to factual findings, "giving special deference to findings that are based on determinations of witness credibility," and *de novo* as to questions of law. *United States v. Hussain*, 835 F.3d 307, 312-13 (2d Cir. 2016) (quoting *United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009)).  We conclude that Lyle's motion was properly denied for two independent reasons: first, Lyle had no reasonable expectation of privacy in the rental car, and, second, the inventory search of the rental car was reasonable.

**A.    *Applicable Law***

**i.    *Reasonable Expectation of Privacy in Rental Car***

The Fourth Amendment guarantees citizens the "right . . . to be secure in their . . . effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  To prove that a search violated the Fourth Amendment, "an accused must show that he had a legitimate expectation of privacy in a searched place or item."  *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)).  The person challenging the search must demonstrate a subjective expectation of privacy in the place searched, and

17

that expectation must be objectively reasonable. *United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988).

When we previously ruled in this case, the question of whether an unauthorized driver has a reasonable expectation of privacy in a rental car divided the various circuit courts, resulting in at least three approaches. *See Lyle*, 856 F.3d at 200-01 (reviewing circuit split). We did not rule on the question, as we decided the appeal on other grounds, as discussed below.

The Supreme Court's recent decision in *Byrd v. United States* resolved the circuit split, holding that the "mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy." 138 S. Ct. at 1531. The Court rejected the government's suggestion of a *per se* rule that unauthorized drivers "always lack an expectation of privacy in the automobile based on the rental company's lack of authorization alone." *Id.* at 1527. Drawing from property principles, the Supreme Court reasoned that "[o]ne of the main rights attaching to property is the right to exclude others, and, in the main, one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude." *Id.* at 1527 (quoting

18

*Rakas v. Illinois*, 439 U.S. 128, 144 n. 12 (1978) (internal quotation marks omitted)). It further noted, however, that the concept of lawful possession is central to the expectation of privacy inquiry, for a "'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search." *Id.* at 1529 (quoting *Rakas*, 439 U.S. at 141 n. 9). Thus, "a person present in a stolen automobile at the time of the search may [not] object to the lawfulness of the search of the automobile" regardless of his level of possession and control over the automobile. *See id*.

### ii. Community Caretaking Function

It is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions -- an authority that is beyond reasonable challenge. *South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976). In *Colorado v. Bertine*, the Supreme Court explained that, under this community caretaking exception to the warrant requirement, police officers may exercise their discretion in deciding whether to impound a vehicle, "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." 479

19

U.S. 367, 375 (1987). The question of whether *Bertine* and similar Supreme Court precedent require an officer's decision to impound a car to be made pursuant to standardized criteria, a question we have not addressed, has created a split among the circuits.

Relying on a stricter interpretation of *Bertine*, two circuits have concluded that an officer's decision to impound a vehicle as part of its role as a community caretaker must be guided by a standardized procedure. *See United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004) (holding that "[s]ome degree of standardized criteria or established routine must regulate these police actions . . . to ensure that impoundments and inventory searches are not merely a ruse for general rummaging in order to discover incriminating evidence" (internal quotation marks omitted)); *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996) ("Among those criteria which must be standardized are the circumstances in which a car may be impounded."). Taking a slightly different approach, the D.C. Circuit has held that "if a standard impoundment procedure exists, a police officer's failure to adhere thereto is unreasonable and violates the Fourth Amendment." *United States v. Proctor*, 489 F.3d 1348, 1354 (D.C. Cir. 2007). The Tenth Circuit has held that standardized procedures are not required where an

20

officer exercises "the community-caretaking functions of protecting public safety and promoting the efficient movement of traffic," but are required in other cases. *United States v. Sanders*, 796 F.3d 1241, 1245 (10th Cir. 2015).

The First, Third, and Fifth Circuits, however, have rejected the standardized criteria requirement, and instead focus their inquiry on the reasonableness of the impoundment under the circumstances. *See United States v. McKinnon*, 681 F.3d 203, 208 (5th Cir. 2012) (per curiam) (hinging analysis upon "the reasonableness of the 'community caretaker' impound viewed in the context of the facts and circumstances encountered by the officer" (citation omitted)); *United States v. Smith*, 522 F.3d 305, 314 (3d Cir. 2008) (declining to adopt "the more structured approach . . . requiring that there be standardized police procedures governing impoundments"); *United States v. Coccia*, 446 F.3d 233, 239 (1st Cir. 2006) ("[I]mpoundments of vehicles for community caretaking purposes are consonant with the Fourth Amendment so long as the impoundment decision was reasonable under the circumstances."). These circuits read *Bertine* "to indicate that an impoundment decision made pursuant to standardized procedures will most likely, although not necessarily always, satisfy the Fourth Amendment." *Coccia*, 446 F.3d at 238.

### B. Application

#### i. Reasonable Expectation of Privacy in Rental Car

In our prior decision, we specifically declined to decide whether an unauthorized driver ever has a reasonable expectation of privacy in a rental car. Instead, we concluded, and now reaffirm, that Lyle lacked standing not just because he was an unauthorized driver, but because he was an unlicensed one. Accordingly, Lyle's use of the rental car was both unauthorized *and* unlawful. *See* N.Y. Vehicle & Traffic Law § 511 (prohibiting operating a car without a valid license). Lyle should not have been driving any car because his license was suspended, and a rental company with knowledge of the relevant facts certainly would not have given him permission to drive its car nor allowed a renter to let him do so. Under these circumstances, Lyle did not have a reasonable expectation of privacy in the rental car. *See United States v. Haywood*, 324 F.3d 514, 516 (7th Cir. 2003) (declining to resolve circuit split over whether unauthorized driver had reasonable expectation of privacy in rental car, because unauthorized driver also had suspended license and the combination resulted in no reasonable expectation of privacy); *cf. United States v. Tropiano*, 50 F.3d 157, 161 (2d Cir. 1995) ("[W]e think it obvious that a defendant who knowingly

22

possesses a stolen car has no legitimate expectation of privacy in the car."); *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991) ("To mount a challenge to a search of a vehicle, defendants must show, among other things, a legitimate basis for being in it, such as permission from the owner.").

*Byrd* does not require a different result. The Court there held that an unauthorized driver in sole possession of a rental car could have a legitimate expectation of privacy in the vehicle because even an unauthorized driver, in the right circumstances, could have "lawful possession and control and the attendant right to exclude." 138 S. Ct. at 1528. The Court noted that "there may be countless innocuous reasons why an unauthorized driver might get behind the wheel of a rental car and drive it -- perhaps the renter is drowsy or inebriated." *Id.* at 1529.

This reasoning does not apply to the circumstances here, where Lyle was not only the driver of the vehicle but the sole occupant. Because Lyle did not have a valid driver's license, it was unlawful for him to be operating the vehicle. He did not have *lawful* possession and control of the vehicle in the sense that he unlawfully drove the vehicle onto the scene and could not lawfully drive it away. *See id.* (reaffirming conclusion in *Rakas v. Illinois* that "'wrongful'

23

presence at the scene of a search would not enable a defendant to object to the legality of the search," "[n]o matter the degree of [a defendant's] possession and control.").  While the absence of a valid license alone may not destroy an unauthorized driver's expectation of privacy, Lyle's possession and control of the car was unlawful the moment he started driving it.  Just as a car thief would not have a reasonable expectation of privacy in a stolen car, *id.*, an unauthorized, unlicensed driver in sole possession of a rental car does not have a reasonable expectation of privacy in the vehicle.  Therefore, because Lyle's operation of the car rendered his possession and control unlawful, *Byrd* is distinguishable.

Further, unlike the Eighth and Ninth Circuits, which have held that a defendant may have standing to challenge a search of a rental car despite lacking a valid license and authorization under the rental agreement if he received an authorized driver's permission, *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998); *United States v. Thomas*, 447 F.3d 1191 (9th Cir. 2006), we conclude that an authorized renter's permission is not determinative of whether a defendant has a reasonable expectation of privacy.  Indeed, *Byrd* explicitly rejected the notion that legitimate presence alone affords a defendant with a reasonable expectation of privacy.  138 S. Ct. at 1527 (quoting *Rakas*, 439 U.S. at

24

148 (noting that legitimate presence is relevant, but not controlling)). While a defendant does not lose all his Fourth Amendment rights simply by engaging in illegal acts, he may still lack standing to challenge a search when the law prevents him from being there in the first place, even with the owner's permission. *See United States v. Schram*, 901 F.3d 1042, 1045 (9th Cir. 2018) (rejecting argument that defendant had standing to object to the search of his girlfriend's house because the no-contact order prohibiting him from contacting his girlfriend was vitiated by her consent to enter the property). Here, even assuming that, under different circumstances, an unlicensed driver may have an expectation of privacy in a rental car, Lyle's possession and control was unlawful while driving the rental car both without a license and without authorization. *Cf. United States v. Walton*, 763 F.3d 655, 663 (7th Cir. 2014) (holding that defendant, who was passenger at time of search and sole authorized driver listed on rental agreement, had reasonable expectation of privacy in rental car despite lacking driver's license because "[a] driver of a car does not lose all Fourth Amendment protections simply because his license is invalid," but observing that conclusion would not obtain if person were both unlicensed and unauthorized).

Lyle argues that he was not operating the vehicle when he was arrested and that he lawfully possessed the vehicle. These arguments ignore the fact that Lyle was seen by the agents driving the vehicle, and, indeed, he eventually admitted as much. Because he was driving the vehicle illegally, Lyle did not have *lawful* possession or control of the vehicle and he does not have standing to challenge the search.

Lyle's reliance on the Sixth Circuit's decision in *United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001), is misplaced. *Smith* presented unique facts. Specifically, Smith was not only the husband of the renter, but he also "had a business relationship with the rental company" because he had "called the rental company to reserve the rental vehicle," "was given a reservation number," and "provided the company with his credit card number, and that credit card was subsequently billed for the rental of the vehicle." *Id.* In light of these facts, the Sixth Circuit determined that "Smith was the *de facto* renter of the vehicle" and that, therefore, he had a legitimate expectation of privacy in the rental car. *Id.* at 586-87. Lyle was not the *de facto* renter of the car at issue here. Moreover, the Sixth Circuit also noted that Smith was a licensed driver. *Id.* at 586 ("Smith

26

was a licensed driver . . . . Therefore, it was not illegal for Smith [to] drive the vehicle."). For these reasons, *Smith* is distinguishable.

Accordingly, we adhere to our original conclusion that Lyle lacked a reasonable expectation of privacy in the rental car, and the district court did not err in denying his motion to suppress.

### ii. Impoundment of Rental Car

Even assuming Lyle had a legitimate privacy interest in the rental car, his challenge to the inventory search fails on the merits as the impoundment of the rental car did not violate the Fourth Amendment.[2] The Supreme Court has repeatedly held that the touchstone of the Fourth Amendment is reasonableness, *see United States v. Ramirez*, 523 U.S. 65, 71 (1998), which "in turn, is measured in objective terms by examining the totality of the circumstances," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Thus, in line with the First, Third, and Fifth Circuits, we conclude that "whether a decision to impound is reasonable under the Fourth

---

[2] Some courts have concluded that there are two inquiries: first, whether the impoundment of a car is reasonable; and second, if so, whether the subsequent search of the car after the impoundment is reasonable. *See, e.g., Duguay*, 93 F.3d at 351 ("[T]he decision to impound (the 'seizure') is properly analyzed as distinct from the decision to inventory (the 'search')."); *Coccia*, 446 F.3d at 237 n. 5 (same). Here, Lyle has challenged only the impoundment and not the subsequent search of the rental vehicle. Hence, we need not reach the second inquiry.

27

Amendment is based on all the facts and circumstances of a given case." *Coccia*, 446 F.3d at 239. While the existence of and an officer's adherence to a standardized criteria may be helpful in evaluating the reasonableness of an impoundment, we decline to adopt a standardized impoundment procedure requirement.

Using a totality of the circumstances analysis, we conclude that the impoundment here was reasonable under the Fourth Amendment even absent standardized procedures. Here, at the time of his arrest for driving with a suspended license and for possessing an illegal knife, Lyle was the rental car's driver and sole occupant. As there was no third party immediately available to entrust with the vehicle's safekeeping, the officers could not be certain how long the rental car would be unattended in Lyle's absence. Even if Lyle did not expect to be in custody long, Lyle would not have been able to operate the car himself upon release due to his suspended license. Although Lyle asked for the opportunity to arrange for his girlfriend, the authorized driver under the rental agreement, to remove the rental car, the police were not required to grant the request. *See Bertine*, 479 U.S. at 374-75; *see also Duguay*, 93 F.3d at 353 & n. 2 (holding impoundment of car unconstitutional when the vehicle's other occupant

was present at the arrest and could "provide for the speedy and efficient removal of the car from public thoroughfares," but noting that the Seventh Circuit has affirmed impoundments where the arrestee is the vehicle's sole occupant and is legitimately arrested). Instead, by impounding the vehicle, the officer ensured that the rental vehicle was not left on a public street in a busy midtown Manhattan location where it could have become a nuisance or been stolen or damaged and could have become illegally parked the next day. *See Opperman*, 428 U.S. at 368-69 (describing as "beyond challenge" the authority of police "to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience," such as vehicles that "violate parking ordinances"); *Sanders*, 796 F.3d at 1249 ("*Opperman* establishes that if a vehicle is obstructing or impeding traffic on public property, it can be impounded regardless of whether the impoundment is guided by standardized procedures."). Moreover, there is no indication that the officers did not act in good faith or solely for the purpose of investigation in exercising their discretion to impound the rental car.

Our decision in *United States v. Lopez*, 547 F.3d 364 (2d Cir. 2008), is instructive. There, although our discussion primarily concerned the constitutionality of the inventory search itself, we concluded that the

circumstances called for the impoundment of Lopez's car despite any showing of a standardized impoundment policy. *Id.* at 372. Similar to Lyle, Lopez was arrested and there was no one immediately available to move his car for safekeeping in Lopez's case because the only other passenger was also arrested. *See id.* at 366-67. Moreover, like Lyle's car, Lopez's car was parked on a city street. *Id.* at 366.

Thus, even if Lyle had a reasonable expectation of privacy in the rental car, the district court did not err in denying his motion to suppress.

## II. *The Proffer Agreement Waiver*

We review the district court's interpretation of the scope of a proffer agreement waiver *de novo* and its evidentiary rulings for abuse of discretion. *Rosemond*, 841 F.3d at 107.

### A. *Applicable Law*

Ordinarily, a "statement made during plea discussions with an attorney for the prosecuting authority" that does not result in a guilty plea is not admissible against the defendant who made the statement. Fed. R. Evid. 410(a)(4). The protections provided by Rule 410, however, can be waived, including in a proffer agreement with the government, provided that such

30

waiver is knowing and voluntary. *Rosemond*, 841 F.3d at 107; *United States v. Velez*, 354 F.3d 190, 194-95 (2d Cir. 2004).

To determine whether a proffer agreement's waiver provision applies, we ask first whether the defendant has offered any evidence or made a factual assertion that would trigger the Rule 410 waiver, and, "if so, whether the proffer statement 'fairly rebut[s]' the fact asserted or evidence offered or elicited." *Rosemond*, 841 F.3d at 107. If the waiver has been triggered and the proffer statement properly rebuts the assertion triggering the waiver, the government may offer the proffer statement. *Id.*

In *Rosemond*, we gave examples of factual assertions that will trigger the proffer waiver, including "asserting, in an opening statement, that someone other than the defendant was the real perpetrator of the crime," *id.* at 109 (citing *United States v. Barrow*, 400 F.3d 109, 114, 119 (2d Cir. 2005)), and "arguing that a shooting was 'an intended kidnapping gone wrong,' when the defendant admitted in a proffer session that the shooting was 'an intentional murder,'" *id.* at 110 (quoting *United States v. Gomez*, 210 F. Supp. 2d 465, 472 (S.D.N.Y. 2002)).

**B.**   *Application*

The district court properly held that the waiver was triggered by Lyle's counsel's statement during opening argument that "we dispute [] the idea

that [Lyle] was a dealer." Tr. 28. Lyle's proffer agreement contained a waiver that allowed his statements to come in "to rebut any evidence or arguments offered by or on behalf of [Lyle]." Lyle App. 36.

As this Court has recognized, a defense argument does not trigger a waiver if it "simply challenge[s] the sufficiency of government proof on [the] elements." *Barrow*, 400 F.3d at 119. But "a statement of fact in a defense opening, such as [a] statement . . . unequivocally identifying [someone other than defendant] as the real perpetrator of the charged crimes," is a factual assertion that would trigger a waiver provision. *Id.* Here, defense counsel did not ascribe the charged crime to someone else, but he did more than challenge the sufficiency of the government's proof. Rather than argue that the government would not adduce credible evidence that Lyle was a drug dealer, counsel disputed the very idea that Lyle was a dealer. This is the functional equivalent of an affirmative statement that Lyle, in fact, did not deal methamphetamine. This assertion was belied by Lyle's proffer admissions and, thus, triggered the waiver provision in the proffer agreement.

Lyle's proffer statements fairly rebut his counsel's opening argument that Lyle was not a dealer. The proffer statements at issue included that (1) Lyle

32

repeatedly distributed "small packages" of methamphetamine; (2) Lyle accompanied another person to obtain and deliver methamphetamine; and (3) Lyle knew the location of the methamphetamine supplier. Taken together, these statements imply participation in a drug distribution operation and thus fairly rebut Lyle's counsel's argument in his opening statement that Lyle was a mere user of methamphetamine and not a dealer. *See Barrow*, 400 F.3d at 120-21 (emphasizing that "proper rebuttal is not limited to direct contradiction" but "encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary").

Hence, we conclude that the district court did not abuse its discretion in admitting Lyle's proffer statements.

### III. *The Admission of Lyle's Redacted Statements*

#### A. *Applicable Law*

In *Bruton v. United States*, 391 U.S. 123, 135-36 (1968), the Supreme Court held that admission of a non-testifying co-defendant's confession naming the defendant as a perpetrator at their joint trial violates the latter's Sixth Amendment right to cross-examination. The Court later made clear that a non-

33

obvious redaction of a co-defendant's confession to eliminate any references to the defendant will eliminate any *Bruton* problem. *See Gray v. Maryland*, 523 U.S. 185, 195-97 (1998); *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987).

We have consistently held that the introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun does not violate *Bruton*. *See, e.g., United States v. Jass*, 569 F.3d 47, 58 (2d Cir. 2009) (noting that operative questions when evaluating *Bruton* claim are "(1) did the redacted statement give any indication to the jury that the original statement contained actual names, and (2) did the statement standing alone otherwise connect co-defendants to the crimes" (internal quotation marks and ellipsis omitted)). In *United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989), for example, we affirmed a conviction based in part on a co-defendant's statement that was redacted to reference "others," "other people," and "another person." *Id.* at 1135.

To determine whether a redaction is sufficient under *Bruton*, we view the redacted statement separate and apart from any other evidence admitted at trial. *Id.* (citing *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985)); *see also United States v. Williams*, 936 F.2d 698, 700-01 (2d Cir. 1991) ("[T]he appropriate analysis to be used when applying the *Bruton* rule requires that we

34

view the redacted confession in isolation from the other evidence introduced at trial. If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant.").

### B. *Application*

Van Praagh contends that his constitutional rights were violated by the admission of Lyle's redacted proffer and post-arrest statements. We ordinarily review evidentiary rulings for abuse of discretion; however, Van Praagh did not object to the introduction of the redacted statements at trial, and so we review the admission of this evidence for plain error. *See United States v. Pierce*, 785 F.3d 832, 840 (2d Cir.), *cert. denied*, 136 S. Ct. 172 (2015).[3]

The redacted statements did not violate *Bruton*. The neutral terms "individual" and "person," which were substituted for proper names with the

---

[3] Van Praagh contends that his *Bruton* argument was preserved by his counsel's objection to the admission of Lyle's unredacted statements and by Lyle's counsel's objection to the redacted statements. Admission of unredacted statements, however, is a different and independent issue, and Van Praagh cites no authority suggesting that one party's counsel may preserve another party's claim of error when the other party's counsel fails timely to join in the objection. Accordingly, plain error review applies.

exception of that of a supplier -- "Brendan or Brandon," Tr. 436, 534 -- were not so obvious as to indicate to the jury that the original statements contained actual names. This was an ongoing criminal enterprise where many people were involved and the government introduced evidence of methamphetamine dealing by several people. Thus, the substitutions alone did not necessarily identify Van Praagh. Further, Lyle's redacted statements sounded sufficiently natural. For instance, he admitted that he had "first become involved in methamphetamine" through "someone" he "knew . . . from work," Tr. 517-18, and that the individual for whom he worked as a "runner" "asked him to hold something for him" in the trunk of the rental car. Tr. 435, 534. Because such statements "might actually have been said by a person admitting his own culpability in the charged conspiracy while shielding the specific identity of his confederate," they do not violate *Bruton*. *Jass*, 569 F.3d at 62. Nor did the redacted statements, viewed in isolation, contain any information indicating that Van Praagh was the "individual" in question, let alone information that would "immediately inculpate" him. *Id.* at 61 (internal quotation marks omitted).

Van Praagh relies on *United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014), to support his contention that the redactions violated *Bruton*, but *Taylor* is

36

distinguishable. *Taylor* involved a *single* robbery of a drug store by four people. *Id.* at 20-21. One of the four, Luana Miller, became a cooperating witness, and another, Curtis Taylor, gave post-arrest confessions. *Id.* At the trial of Taylor and the two other co-defendants, the trial court admitted Taylor's post-arrest confessions but required their redaction to omit identifications of his two co-defendants. In the portions of the confessions that were admitted, Miller's name was mentioned but the names of the two co-defendants were replaced with "two other individuals," "the person," and "the driver." *Id.* at 29. We determined that in this circumstance the redactions were so obvious as to violate *Bruton*. Our reasoning was as follows. First, Miller's name was used throughout and, "[i]f Taylor had been trying to avoid naming his confederates, he would not have identified one of them -- Miller -- in the very phrase in which the names of the other confederates are omitted." *Id.* Second, the wording of the redacted statements, *i.e.*, "[t]he robbery was the idea of the person who waited with Luana Miller and Taylor at the gas station," was stilted and unnatural. *Id.* Third, in this context, the "reference to 'two other individuals' [was] suspiciously closer to the speech of a prosecutor than that of a perpetrator." *Id.* On the basis of these factors, we determined that it was obvious that names had been omitted from the

37

statements and, therefore, "the choice of implied identity [was] narrow. The unnamed persons correspond[ed] by number (two) and by role to the pair of co-defendants . . . [and] [t]he jury could immediately infer, on the evidence of the redacted confession alone, that Taylor had likely named the co-defendants." *Id.*

This case is unlike *Taylor*. First, Lyle's statements referred to *multiple* people -- not only one unnamed person to correspond to the one co-defendant, Van Praagh. This did not present the necessary process-of-elimination problem that left the jury's "choice of implied identity narrow" as in *Taylor*. *Id.* Second, in addition to Van Praagh's methamphetamine dealing, the government introduced evidence of methamphetamine dealing by its two cooperating witnesses -- Tarantino and Hodges -- as well as several others. Because Lyle's statements did not reference by name those cooperating witnesses, the jury could reasonably have inferred that *they* were the "other persons" Lyle was referring to in his redacted statements. Third, Lyle's statements referred to people involved in a conspiracy to engage in *ongoing* criminal conduct, not a single criminal act like in *Taylor*. For all of these reasons, *Taylor* is inapposite.

We also note that the district court here gave a limiting instruction. *See Taylor*, 745 F.3d at 28 ("It matters that the district court gave limiting

38

instructions" because "[w]e normally assume that jurors follow limiting instructions"). The district court specifically instructed the jury that "Lyle's statement about his own conduct may not be considered or discussed by you with regard to Mr. Van Praagh." Tr. 713.

Finally, Van Praagh's constitutional rights were not violated by Lyle's counsel eliciting testimony on cross-examination that his client's statements had been redacted for presentation at trial and that his client had indeed provided actual names in his proffer and post-arrest statements. Again, because Van Praagh did not object during Lyle's attorney's cross-examination, we review for plain error. In urging error, Van Praagh relies on *Gray v. Maryland*, 523 U.S. 185 (holding that "considered as a class, redactions that . . . notify the jury that a name has been deleted" violated the Confrontation Clause). But *Gray*'s focus was on the inadequacy of the government's redaction. Van Praagh can point to no case plainly identifying *Bruton* error when a defendant, whose post-arrest statements are being offered against him, elicits the fact of redaction, or elicits parts of the redacted statement.

Van Praagh fails to show plain error here. First, his case is distinguishable from *Gray* in that there the redaction inadequacy was attributable

39

to the prosecution. In any event, Van Praagh cannot satisfy the prejudice prong of plain error because in his case the redacted statements referred to multiple "individuals," which means the revelation could not have been immediately inculpatory. *See Jass*, 569 F.3d at 61.

Further, during cross-examination, Lyle's attorney elicited from the same witness several of the names that Lyle mentioned during his post-arrest and proffer statements, including "Zaron," "Ted," "Bob," and "Joe." Tr. 525. In our view, that testimony made it *less*, not more, obvious to the jury that Lyle had also mentioned Van Praagh. Van Praagh's name was not mentioned at all, and Lyle's counsel's elicitation of other names suggested that the "other persons" mentioned were the individuals whose names Lyle's counsel elicited, not Van Praagh. For all of these reasons, the admission of Lyle's redacted statements was not plainly erroneous.

## IV.    *Admissibility of Lyle's New Jersey Arrest*

We review a district court's evidentiary rulings for abuse of discretion, which we will find only if the district court "acted arbitrarily and irrationally." *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (quoting *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002)).

40

## A.	Applicable Law

Federal Rule of Evidence 404(b) provides:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

Fed. R. Evid. 404(b). "The Second Circuit's 'inclusionary rule' allows the admission of such evidence 'for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence.'" *Greer*, 631 F.3d at 614 (quoting *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)).

Not all evidence of uncharged misconduct, however, is prohibited by Rule 404(b). Rather,

> [E]vidence of uncharged criminal activity is not considered other crimes evidence . . . if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.

*United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); *see also Inserra*, 34 F.3d at 89 ("[E]vidence of other bad acts may be

41

admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

## B.     *Application*

The district court did not abuse its discretion in admitting the evidence seized during the New Jersey arrest in January 2014.  First, that evidence was not barred by Rule 404(b) because the arrest "arose out of the same transaction or series of transactions as the charged offense."  *Carboni*, 204 F.3d at 44.  Specifically, as discussed above, Lyle argued at trial that he was only a methamphetamine user -- not a dealer.  The government rebutted that argument with evidence of Lyle's New Jersey arrest.  In summation, the government argued:

> 14 or 15 grams [of methamphetamine] is still many hundreds, if not thousands, of dollars of meth. . . .  Also, you know what else was in that room?  A dozen baggies, a scale, $3,000 in cash.  He was not weighing out meth for his own personal use.  That was meth he was going to sell.

Tr. 629.  In other words, the evidence seized pursuant to the New Jersey arrest was not evidence of *other* crimes; it was evidence of the very crime charged in count one of the indictment, a conspiracy involving Lyle, Van Praagh, and others to distribute methamphetamine from in or about December 2012 through in or

about January 2014.  Accordingly, evidence of the New Jersey arrest was admissible as direct proof of the methamphetamine distribution conspiracy.

Second, and in any event, the evidence of the New Jersey arrest fits within the Rule 404(b) inclusionary rule because it shows Lyle's knowledge and intent regarding the contents of the rental car.  Because Lyle argued throughout trial that he did not know what was in the trunk of the rental car, his knowledge and intent were at issue.  *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) ("When the defendant disavows awareness that a crime was being perpetrated, and the government bears the burden of proving the defendant's knowing possession as an element of the crime, knowledge is properly put in issue.").  The fact that Lyle was in possession of 14-15 grams of methamphetamine and tools of the drug trade less than a month after he was arrested with the rental car is probative of his knowledge and intent regarding the contents of the rental car.  In addition, the probative value of this evidence was not "substantially outweighed" by the risk of unfair prejudice as it "did not involve conduct any more sensational or disturbing than the crimes with which [Lyle was] charged."  *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).  Accordingly, the district court acted

43

well within its discretion in finding that the probative value of the evidence outweighed the threat of unfair prejudice.

## V.    *Sufficiency of the Conspiracy Evidence*

We review Van Praagh's challenge to whether the evidence was sufficient to support his conspiracy conviction *de novo*, "view[ing] the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Rosemond*, 841 F.3d at 113 (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)).  We must affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016)).

The crux of a conspiracy is an agreement between two or more persons to join together to accomplish something illegal.  *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) ("To prove a conspiracy, the evidence must show that 'two or more persons agreed to participate in a joint venture intended to commit an unlawful act.'" (quoting *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997))).  We have recognized a "narrow exception" to the conspiracy rule

44

for a transaction between a buyer and seller of drugs. *Id.* Under this exception, "the existence of a buyer-seller relationship does not *itself* establish a conspiracy; however, where there is additional evidence showing an agreement to join together to accomplish an objective beyond the sale transaction, the evidence may support a finding that the parties intentionally participated in a conspiracy." *United States v. Hawkins*, 547 F.3d 66, 72 (2d Cir. 2008); *see also United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010) ("[T]he exception does not protect either the seller or buyer from a charge that they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer." (alteration and internal quotation marks omitted)). The question thus becomes "whether the evidence in its totality suffices to permit a jury to find beyond a reasonable doubt that the defendant was not merely a buyer or seller of narcotics, but rather that the defendant knowingly and intentionally participated in the narcotics-distribution conspiracy by agreeing to accomplish its illegal objective beyond the mere purchase or sale." *Hawkins*, 547 F.3d at 73-74.

Van Praagh did not request a buyer-seller instruction at trial and so we review for plain error. *Pierce*, 785 F.3d at 840. The district court did not

45

plainly err in failing to give a buyer-seller instruction because the government presented ample evidence of a narcotics conspiracy beyond a buyer-seller relationship between Van Praagh and Lyle.

First, Van Praagh sold methamphetamine not just to Lyle, but to others. Indeed, he received weekly shipments of methamphetamine, which he then sold to others. With assistance from Tarantino, he regularly sold methamphetamine out of his apartment in Queens as well as out of hotels, and he made deliveries to "[p]robably 50" customers. Tr. 124.

Second, the quantity of drugs was consistent with a drug trafficking operation. Tarantino testified that Lyle repeatedly purchased pound-level quantities of methamphetamine at $19,000 to $25,000 per pound. *See United States v. Contreras*, 249 F.3d 595, 600 (7th Cir. 2001) (noting that repeat sales suggest "more than a transient relationship," but are "by themselves" insufficient to support an inference of a conspiracy between the supplier and purchaser); *see also United States v. Murray*, 618 F.2d 892, 902 (2d Cir. 1980) ("[O]ne who deals in large quantities of narcotics may be presumed to know that he is a part of a venture which extends beyond his individual participation." (quoting *United States v. Magnano*, 543 F.2d 431, 433-34 (2d Cir. 1976)).

Accordingly, the district court did not plainly err in failing to *sua sponte* give a buyer-seller instruction. *See United States v. Medina*, 944 F.2d 60, 65-66 (2d Cir. 1991) (holding that the district court was not required to give a buyer-seller instruction "where . . . there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use" because "[u]nder such circumstances, the participants in the transaction may be presumed to know that they are part of a broader conspiracy").

**VI.** *Reasonableness of Van Praagh's Sentence*

We review the substantive reasonableness of a sentence under a "deferential abuse-of-discretion standard." *United States v. Aldeen*, 792 F.3d 247, 251 (2d Cir. 2015) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). The question is whether Van Praagh's below-Guidelines sentence of 144 months' imprisonment "shock[s] the conscience," constitutes a "manifest injustice," or is otherwise substantively unreasonable. *Id.* at 255 (quoting *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009)); *see also United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011) (per curiam) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances. It is therefore difficult

to find that a below-Guidelines sentence is unreasonable." (internal quotation marks and citation omitted)).

Van Praagh's below-Guidelines sentence of 144 months was substantively reasonable. The district court fully explained its reasoning. It considered Van Praagh's "very unhappy upbringing," and the "very positive change" that Van Praagh "seem[ed] to be undergoing." Van Praagh App. 58-59. The district court determined, however, that a 144-month sentence was sufficient but not greater than necessary because Van Praagh (1) had committed a "very serious" crime; (2) had a "long history of drug dealing" and "plenty of opportunities to change"; (3) clearly had been "in charge of dealing more drugs at a higher level than [Lyle]"; and (4) had a "prior record suggest[ing] that he still continues to be a danger to the community." *Id.*

Van Praagh's argument that, like Lyle, he should have been sentenced to the statutory mandatory minimum of 120 months' imprisonment is unavailing. As the district court noted, Van Praagh had a "more important role" than Lyle. *See* Van Praagh App. 62. Van Praagh supplied Lyle with pound quantities of methamphetamine on multiple occasions. Van Praagh had people working for him to make drug deliveries. Moreover, Van Praagh's criminal

48

history was clearly more serious than Lyle's. Although neither man had previously served any jail time for his crimes, Van Praagh's previous convictions included crimes relating to methamphetamine, while Lyle had only a violation for marijuana possession twenty years prior to the instant offense conduct. In these circumstances, we identify no abuse of the district court's sentencing discretion and no merit in Van Praagh's claim that his sentence is substantively unreasonable.

*CONCLUSION*

To summarize, we conclude as follows:

1. Because Lyle was an unlicensed, as well as unauthorized, driver of the rental car, he had no reasonable expectation of privacy in that car, and the district court did not err in denying his motion to suppress. Even assuming Lyle had a legitimate privacy interest, the search and seizure of the rental car did not violate the Fourth Amendment.

2. Lyle's counsel's statement in his opening argument that "we dispute [] the idea that [Lyle] was a dealer," Tr. 28, triggered the waiver in Lyle's proffer agreement, and the proffer statements, taken together, fairly rebutted his

counsel's argument that Lyle was a mere user of methamphetamine and not a dealer.

3.      The admission of Lyle's redacted proffer and post-arrest statements in the defendants' joint trial was not plainly erroneous because the statements substituted neutral terms for actual names and had no otherwise identifying information.  Further, the district court did not plainly err in allowing Lyle's counsel, without Van Praagh's objection, to elicit testimony that Lyle's statements had been redacted, that Lyle had provided actual names in his proffer and post-arrest statements, and what several of those names were because those disclosures did not prejudice Van Praagh and, indeed, made it *less* obvious to the jury that Lyle was referring to Van Praagh in his statements.

4.      The district court did not abuse its discretion in admitting the evidence seized during Lyle's New Jersey arrest because (a) it was direct evidence of the conspiracy charged in count one of the superseding indictment, and (b) even if it was not direct evidence, it was not "other crimes evidence" prohibited by Federal Rule of Evidence 404(b) because it showed Lyle's knowledge and intent regarding the contents of the rental car on December 11, 2013.

5.     The district court did not plainly err in failing to *sua sponte* give a buyer-seller instruction to the jury because the government presented ample evidence of a narcotics conspiracy.

6.     Van Praagh's below-Guidelines sentence of 144 months' imprisonment was substantively reasonable.

Accordingly, the judgments of the district court are **AFFIRMED**.